As this Court is aware, this case arises out of a claim from a former student of the Lewisville Independent School District based on violations of Title IX for its failure or its delay in investigating the claims of a violent sexual assault that she sustained by a fellow student. This Court should reverse the District Court's summary judgment because a reasonable juror could have concluded that it was clearly unreasonable for the school district to violate well-established federal regulations requiring immediate investigation into student sexual assaults. But notwithstanding those regulations and this Court's precedent, noting that deliberate indifference is a fact-laden, subjective inquiry, the District Court concluded that as a matter of fact, a three-month delay of the investigation was reasonable, or not clearly unreasonable. Mr. McHenry So let me ask you first, there's some question in the record about when the investigation by the school district started. In fact, we can start with maybe the Friday, October 12th. There seems to be an e-mail in the record that Ms. Fletcher, parent of the plaintiff, e-mailed Ms. Denson-Whitehead asking her not to speak with her daughter about bullying on that day. Is that not correct? Mr. McHenry I believe that is correct, Your Honor. There is an e-mail from Mrs. Fletcher to Ms. Whitehead. Mr. McHenry Okay, well let's go further down then. There are two relevant dates, it seems. November 8th of 2012 is the date, I believe, that you're arguing at the latest an investigation should have commenced. Is that correct? Mr. McHenry Either November 8th or November 2nd, one of the two. Mr. McHenry Okay, okay, that's fine. And then the district judge, and I believe the school district, rely upon a December date, like mid-December of 2012, which of course implicates the delay based, or the argument based on the holidays. What record evidence are you relying on for that November 8th or that November 2nd date for commencement? Mr. McHenry There is an e-mail that was sent from Rebecca McDonald, who is essentially the assistant superintendent, to the Title IX coordinator, Kevin Rogers. That e-mail is dated November 2nd, and it specifically said two days ago the police department has cleared us to begin our investigation. Now there's some dispute in the record as to whether that's a full investigation or whether it was only an investigation into the extracurricular code of ability to play football. But regardless, and I think this is the point that I'd like to drive home here, what the Louisville Police Department believe is the appropriate date for Dr. Rogers to start his investigation is entirely irrelevant here. Dr. Rogers is governed by Title IX, not the opinion of the Louisville Police Department. And Title IX clearly states that there is a difference between a criminal investigation and the obligations under Title IX. Now admittedly, we call it the dear colleague letter, and it's referenced many times in the briefs. I don't need to go into the whole thing. It notes that while the police are gathering evidence, you know, you shouldn't disrupt their inquiry. It also notes that it should really generally take no more than 3 to 10 days. But there's a difference between investigating bullying, investigating the treatment that a student is receiving, and investigating the material witnesses in a sexual assault case. Here it's undisputed that the person in charge of the investigation did not even interview my client until January of 2013. So... Was there anything that suggested any communication in the record wherein the mother of the plaintiff, contrary to her October 12th email, said, we expect you to go forward and my daughter is here to be interviewed and is cooperating? In other words, something to contradict the Friday, October 12th email. Respectfully, Your Honor, I can't say off the top of my head whether Mrs. Fletcher has, if there's evidence in the record showing Mrs. Fletcher gave the school permission, but the school doesn't need Mrs. Fletcher's permission. They're obligated under federal law to do an investigation. Now, there's certainly no evidence in the record... Okay, but you just said they didn't interview my client until... So they can, you're right, they can investigate without interviewing the plaintiff in this case, but you just said that they didn't interview her until such and such. Perhaps it would have been more articulate for me to say that the school did not begin its investigation until January of 20th. Okay. And that is essentially the point here, Your Honor, is that the trial judge basically stated that as a matter of law, no reasonable juror could have concluded that it was clearly unreasonable for Dr. Rogers to listen to the Louisville Police Department as opposed to the Department of Education. And frankly, there are no cases on point, okay, where there's a three-month delay. There's cases in New York and Georgia that are eight months and a year, and they said those are jury issues. And there's plenty of cases from this court, which both I cited in my brief and my opposing counsel did as well, in which there was an immediate response. So if there's an immediate response, we say, okay, there's no deliberate indifference as a matter of law. Eight months and a year, that's a jury issue. Let's see if it's reasonable. So here we have three months. We have three months, and it's predicated on listening to a police chief or police department as opposed to a Department of Education mandate. Now, is it a good thing or a bad thing that we don't have cases like that? I suggest it's a good thing. The fact is that there's not a lot of Title IX coordinators out there that have no idea of what their responsibilities are, or most school districts don't wait three months to begin their investigations. But to conclude that as a matter of law, this is reasonable or not clearly unreasonable, to borrow a phrase, that's essentially legislating from the bench. That's taking the argument or taking the reasoning out of the community standards and basically imposing by judicial fiat what reasonable is, you know, in the Eastern District of Texas. And for a bunch of policy reasons, that simply doesn't make sense. First, from a practical perspective for this Court, if district courts essentially take all the deliberate indifference inquiry out of the hands of a jury and determine it as a matter of law, it means every Title IX case that comes to this Court will be reviewed de novo. Regardless of whether summary judgment was granted or denied, you could have a full jury trial. But if deliberate indifference is determined as a matter of law, it doesn't matter what the jury finds. It's always up to a panel of appellate judges who review a cold record. Since we're talking about the timing, I guess to put a finer point on it, we're talking about three, as I understood from the briefing, three different instances. One was the off-campus party or what have you, the get-together, I think, at the beginning of the school year in September. And then after that, are these things in rapid-fire succession? It seems like there's some telescoping on a timeline between the in-school bullying that's alleged and then there's some things on the Internet, social media-type bullying. Those are three different acts. Is that correct? Well, there's numerous acts. I think there is three different groupings. I think the evidence is undisputed that my client received numerous communications from her classmates from the time of the incident, from the time that it was made public, throughout. There is a Twitter post that is in evidence that was dated, I believe, in December. But I don't think there's anything in the record that suggests that somehow my client was left alone between September 28th and the date of that Twitter post. In fact, it conclusively establishes the opposite. We know that the date of the incident was September 28th. That's undisputed. We know that on October 1st was when the most egregious activity had, when the alleged rapist stood up on the cafeteria table wearing the clothes that they raped her in and bragged to the school about it. There is at least evidence in the record suggesting that administrators and football coaches knew about it. Now, granted, that evidence comes from my room. That's her belief. Now, they deny that, but again, that's another fact issue. And then we know that Ms. Fletcher finally reported the rape to the school on October 15th, 2008. Let me ask you on page two, you just mentioned about the coaches. On page two, I believe, of your brief, you say that LISD's faculty and coaches witnessed classmates bullying and harassing your client. What specific evidence are you relying on that they witnessed it? I understand the allegations of what happened, but particularly that any faculty or coach witnessed it happen. The footnote reference to the record under that particular sentence points to Ellie Fletcher's deposition testimony. Forgive me for saying, we don't refer to it as IF. It refers to my client's deposition testimony in which she says, these are the people that were around when this was happening to me. Now, my opposing counsel says, well, you have no evidence, no admission from us that we knew that. But again, that's a fact issue for the jury. And I'd like to, if I could point out a case that's not directly on point. It arises out of a 1983 context, but I think is appropriate here. Earlier, January of 2018, this court decided a case called Darden v. City of Fort Worth. And it was a qualified immunity summary judgment that came up here. And this court reversed qualified immunity. Now, qualified immunity is an issue that's usually decided as a matter of law, which a lot of deliberate indifference cases are as well. But in that particular case, there was strong conflicting testimony between the police officers who tased a man to death and all of the other people that were in the room that witnessed it happening. And what this court ultimately concluded is, if there is a general misunderstanding or lack of understanding, lack of conclusive evidence as to what actually happened, then summary judgment can't be appropriate. Because if we don't really know what happened, who heard what, or who said what to whom and when, then how could you possibly say that, as a matter of law, something is reasonable or unreasonable? Doing so would require this court to give more credence to the evidence provided by the movement as opposed to the non-movement. So if there's a disagreement there, summary judgment can't be appropriate. So here we all have fact issues regarding, you know, who or what members of the faculty were aware of this particular incident in the cafeteria and other bullying requests, what this November 2nd email actually referred to, and what was its scope, you know, what investigation was allowed to commence. And we have disagreements in general as to whether Ms. Fletcher, you know, encouraged them or discouraged them from pursuing the investigation. Now, at the end of the day, if a jury is allowed to hear testimony from Dr. Rogers and from Ms. Wahnke and the other folks that were in charge of this investigation and can, you know, contravene that against the testimony of my clients, you know, that's what juries are for. But for this court to just take the raw record, see a dispute in the facts, and then say, well, I believe these folks over those, that's — that simply violates the summary judgment standard of review. What I think is important, and this is a case that I know my opposing counsel knows well because it also involves Lewisville Independent School District, is a case called Lance v. LISD. And in that case, this Court concluded that summary judgment was appropriate on a deliberate indifference claim because it was undisputed that the district investigated the incidents immediately and punished all the students involved and concluded that essentially the parents of that case were complaining about the treatment that the perpetrators received, not about the fact that the school did nothing at all. But the important thing is that this Court cited the Sixth Circuit's opinion in Vance v. Spencer County, and it adopted its holding. And if you would indulge me, I'd like to read just a brief portion of Vance's opinion. According to defendant, as long as a school district does something in response to harassment, it has satisfied the standard. But if this Court were to accept that argument, a school district could satisfy its obligation where a student had been raped by merely investigating and absolutely nothing more. Such minimalist response is not within the contemplation of a reasonable response. And that's a Sixth Circuit holding that this Court adopted. And I respectfully submit that that's what happened here. I anticipate my opposing counsel will come up in a few moments and will say, three months is just simply not unreasonable. We did something. We looked into the matter. We talked to students. We ultimately came to the conclusion that, you know, nobody could actually remember what went on. We weren't certain whether the assault actually ever occurred. We looked into this, and I realize that the parents are disappointed with the punishment or disappointed with the outcome, but we did something. But that's a red herring. Certainly we're disappointed with the outcome of the investigation. But the question is, should that investigation have taken place earlier? And it's obviously a fool's errand to guess what would have happened if it had been done differently. But at the same time, the fact that all of the testimony of the record regarding the investigation that took place in January involves contradictory statements or people that can't recall specific details, respectfully submit that that's why the Department of Education requires an immediate response. Now, certainly, there has to be a tightrope here. I understand that that's the policy interest that's in play, and the Supreme Court has acknowledged that in the Gebzer case. On one side, we don't want every single instance of boys teasing girls or any sexual-related innuendo or conversation in high schools and junior high schools to turn into a federal lawsuit. That's obviously one end of the extreme. But on the other side, Congress enacted Title IX to prevent student-on-student harassment or gender-based discrimination. And if no one is encouraged to bring these suits when extraordinarily egregious conduct like we have here happens, because as a matter of law, the school always wins, well, then you've essentially gutted a federal statute. And obviously, it's a tightrope, and at the bottom of which is, you know, the ostensible, you know, abyss at the bottom of the slippery slope. Counsel, I know you're running out of time, so I don't — I'm sorry to interrupt you, but to — you mentioned the Dear Colleague letter earlier in your argument. To — could you clarify for me, to what extent are you relying on the Dear Colleague letter? To what extent do you think it doesn't matter? You still have a jury question here. Your Honor, I always think there's a jury question. I'm certain that I'm asking this Court to hold that, as a matter of law, it was unreasonable. We're saying that, as a matter of law, we survived the summary judgment. Right, right. I understand that. So the Dear Colleague letter, I believe, sets forth the Department of Education's guidelines for investigations of student-on-student sexual harassment. And this is a document that Louisville ISD's own Title IX Administrator says he wasn't even aware of until December of 2013 — yeah, 2013, well after the incident occurred. Okay. If there's no other questions, I'll save my time. You've saved time for about — and thank you, Mr. — Thank you, Judge. — Mr. Brandt. May it please the Court, Tom Brandt for Louisville ISD. I would ask the Court to affirm the District Court's opinion on the discrimination claim under Title IX. A fact question has not been raised on the issue of deliberate indifference. There have been several pieces of evidence talked about already this morning, and I'd like to go back to those. For one thing, the email that Judge Engelhardt — that you asked about — that went between Ms. Fletcher and Debra Denson-Whitehead, the school counselor. Remember, the timeline was October 10th. Ms. Fletcher comes to the counselor and makes a vague complaint about bullying. And the only thing she says — no names, no details — but she says it might be the bullying, the cheerleader bullying. And she's referring to some cheerleader bullying that had occurred the previous year. That was girls being mean to each other. That is not an implication under Title IX of itself. So the only clue that Debra Denson-Whitehead had on October 10th as to that bullying was that it was possibly some talk to I.F. in the morning. Well, October 10th, I.F. is not in school. She's not in school October 11th either. First time that she has a chance, the counselor has a chance to talk to her, that's when the email comes. And the email string, by the way, October 10th is the date of the first vague report by the mother. October 11th, in the string, you can see that Debra Denson-Whitehead is sending out an email about standing up to bullying and that we don't tolerate bullying in our school. And it's to that email that Ms. Fletcher responds and says, he is at school today, she should just take it easy and try to stay positive. I don't think an intervention should happen today. I can't tell you enough how grateful I am that you're there. What's the date of that email? That is the email, it is email on October 12th, 2012, and it's record 3429. Then the counselor says, hi Ms. Fletcher, I'll let E. have space today and we'll check with her next week. Please also encourage her to come to counseling office if she has specific names. Have a great week. So the counselor is communicating this to the mother, saying I hope she will be sharing specific names, I hope she will feel comfortable enough to come to us. I'll talk to her next week. I will honor your request as a mother. You know your daughter better than I do. You know that she needs some space today. Okay, that's what she did. I will talk to her next week. I hope she comes in. That was Friday, October 12th at 1154. Okay, now what happens that evening is at the football game, Mr. and Mrs. Fletcher are talking to some other parents and it's at that point that these other parents tell Mrs. Fletcher about the party of happened off campus at somebody's private home with no parent supervision whatsoever and doesn't find out about that till much later. But that Friday night at the football game, that's when the Fletchers learn from the other parents that there was a party and there was some communication from that other parent to Mrs. Fletcher that something very bad happened there. Then the Fletchers go to the police. They go to the police first and the police open investigation. It's the Carrollton Police Department. Cole Langston is the SRO, the Student Resource Officer at the school. So he's the school contact for the police. So that happens on Friday night. Saturday they're with the police. Then you go to Monday. Monday comes around and the Fletchers come in and that they talk to Deborah Whitehead again. At this point they say they're talking about rape. They're being very specific. It happened at this party, that sort of thing. All of a sudden the earlier vague complaints of bullying are overwhelmed by this complaint about rape. Deborah Denson Whitehead, the counselor, goes to her assistant principal and her principal and they go to the police. They go to Cole Langston, the SRO, the Student Resource Officer, and they say hey this has come to our attention. He says we already know about it. We've already opened a case back off. Don't investigate this until we've gotten to a certain point. And mind you, at this point I would like to deviate just to talk about the Title IX letter which has now been rescinded by this administration. It was under a previous administration that the Title IX letter was issued. But even under that letter that was issued and has now been withdrawn, even under that letter it does say a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence. That's record 4902. So everyone agrees, anyone who has common sense and everyone who can read that Title IX letter agrees that it is reasonable in the extreme to delay a Title IX investigation at a school if the police have requested you to delay it. And they did. The police did request there to be a delay. But you do recognize, I mean I'm sure you recognize this, that the Title IX letter goes on to say once notified that the police department has completed its gathering of evidence dot dot dot the school must promptly resume and complete its fact-finding for the Title IX investigation. Absolutely, that's what the letter says. Now that gets us to the discrepancy that we've heard of between the November and mid-December dates. Before we move on to that, how do you respond to counsel's argument that even if law enforcement was investigating the events, the alleged rape at late September, by this time there are actions taken by students on the school grounds that appear to not be investigated as well. But certainly law enforcement doesn't put a stop on that type of thing. You have to remember the sequence of the timeline because October 10th was the first complaint. And October 12th was Friday night. That Friday was the last day that Aya was in school. Parents withdrew her, right? So what you're talking about and what Mr. Kee was talking about was the on-campus bullying that occurred when she was on campus. They voluntarily withdrew her from school and then with the cooperation and diligent cooperation of the school district, enrolled her in all-bound services, which mentioned that she got all the academic services of the school, but they were brought to her at home. Why is that significant? Is that because there could be no on-campus bullying after October 12th? There was only on-campus bullying that we didn't, that was never reported to us. It was never reported to us while it was going on. So now you have, you had a vague report of the bullying, never had anything after October 12th, never been a time in the record ever when the plaintiff said, oh I want you to go back and investigate that on-campus bullying. But more the bullying on campus after October 12th because she wasn't on campus. So then we go to, fast forward to the November-December timeline, okay? And in our briefing we went through how carefully there was a release to by the police to say you can investigate the drinking. There was a, remember the coach investigated first, a preliminary investigation before he knew anything about the subset. But he said it was an extracurricular code of conduct, that's what you're drinking, you're on the football team, you have an extracurricular code, you're a higher level of, you're held to a higher level as a student athlete. So he looked into that, but then later Cole Langston said now you can investigate that, but you can't investigate, you cannot investigate sexual assault, not releasing you to that. So where did we get the November 8th date? We get that from a vague email that was from Becky McDonald to Rebecca McDonald to Mark Dalton on November 8th. The subject is news on issue we discussed. Vague because they're trying to just talk about something that is very delicate and don't necessarily want to create specifics. So it's vague, I think intentionally. This is in parts of Becky. I learned, and Mark is the president. Do you have a record reference for this? Sorry. It is record 5071. Okay, thank you. And so you'll see, I learned from Carrollton Police today that they do not intend on filing any charges in the alleged case of sexual assault that we discussed about a week ago. Please let Kevin know, Kevin is the superintendent, please let Kevin know so he can pass on to Dr. Waddell. Thanks. Kevin was an assistant superintendent, Dr. Waddell is the superintendent. But what we have here, first of all, is a vague statement that Becky McDonald then says no, no, no, no, no. That wasn't referring to the sexual assault on September 28th. That wasn't referring to that. That was referring to something else. More importantly, you've got Cole Langston in his affidavit, and this is on record 3623, paragraph 6. He says, in mid-December, I, Cole Langston, informed officials at Hebron High School that the Carrollton Police Department had sufficiently pressed into its investigation of the alleged sexual assault of I.F. that Lewisville could proceed with their own investigation right. First of all, you have, this is a double benefit to the district because number one, it is Cole Langston himself, the police liaison saying, I told them in mid-December that they could begin an investigation. But it also says, you'll notice it says, and sufficiently progressed, and then if you look at the other email, it's talking about they do not intend to file any charges. It can't possibly be that this email is talking about the same situation because we also know from all of the testimony, the affidavits that are in the record from Mark Dalton, from Amanda Wharton, and even from Paul Fletcher himself, everyone knows and admits that the criminal prosecution proceeded against the two young men, and it proceeded all the way to the grand jury. The grand jury then decided, much later, to no bill. So we absolutely know that this email, that just no reasonable jury could believe that this creates a back question on an issue of November 8th. But what the district court did, and I think that's some sort of a shortcut, said, well, even if it did, it's still a reasonable delay. But what I'm saying is, that is something that the district court did get wrong. What, tell me, tell me again, what did it get wrong? It got wrong that the district court should not have even gone to assume argument. He basically said, well, assuming argument that this November 8th date is right, it's still not enough. Well, the district court was required to view the facts in the light most favorable to the non-movement, right? But you're saying the district court didn't have to do that with respect to that piece of evidence? Right, because the evidence was overwhelming and agreed that this can't possibly, logically, be assigned to this particular section, so it had no connection to that at all. But anyway, just if you say, well, let's assume for sake of argument November 8th, you've got two things happening here. You've got, number one, you've got the, what do we do? How do we gear up for this investigation that we've been saying, we've been told to pack off? So you've got November, is it reasonable to say, well, let's start it at the, here we are on November 8th, we're running into the Thanksgiving holiday, Christmas break, we'll start after Christmas break, because we can't start interviewing students before, I mean, there's a lot that can go into that, say, how would you do it during Christmas if we didn't have these kids, if they didn't have part of it, then they'd have to come off or something, come back or something, so what they did was they did the common sense thing, they said, we'll start it then. And did they do anything after the November 8th date, because it seems, well, they were doing things, they were doing things, they were taking care of her needs by taking care of her hormones, by way of investigation, they spoke to no one, yes, they did, they did that when they were released, they did that, so it was a huge thing, and I would add, that would be a true statement to say that educators are not trained investigators, even though their timeline requires a lot of investigation, but they certainly are not trained in criminal investigations, and it makes sense why even the old, respects the difference that police have, but they were doing things to take care of her, they had no reports during that time, although you heard there was something going on during this time, there were no reports to the school that there was anything going on, and then as soon as we started the investigation in January, that's when Ms. Fletcher came with a list of names of people who had been psyched or bullied, and that's when she later came with another examples of each time that she came to us with information, we responded in some way to try to deal with the situation. October 10th, we found out that we didn't seem like we were trying to deal with it, after October 14th, that was when we were said to hold back, but as soon as we were released, we did the investigation into the alcohol, and then we did the investigation into not only the incident of September 28th, then we started looking into the cyber bullying allegations, and then finally the Instagram post that came last, and people were investigated, the police did take action based on our reporting bill to the police, so we did take disciplinary action against individuals who were involved at that time, but we have something generally speaking went from very vague to a long period of kind of silence, to then very specific in January, and us taking action to investigate those very specific allegations at that time. There was never a time when the school district was just exhibiting anything remotely akin to deliberately making a difference. There was, in fact, it would be argued I think against us if we had disregarded the police and their instructions to us, and then have been blamed for ultimately inadvertently sabotaging prosecution in a criminal sense, because I think that would open us up to severe criticism. I think it was a showing of care to say we will respect this and we will let the situation be handled by the police. Now keep in mind, we were not letting the situation be handled by the police and keeping the alleged rapist and the victim together. No, that wasn't happening. If that were happening, we'd have a different situation and we'd have to be addressing how did the school district address that, what did they do? But they didn't have to address that because the child was taken out of the school and was given a hometown service. I think that the district exhibited clear caring and professionalism throughout. Did it do a perfect investigation? No, but that's not the standard. Did it reach the result that the parents wanted? No, but that's not the standard. The feedback that the parents wanted from day one was to have the boys removed, period, from day one. And we said they have due process plans. Two, we cannot simply just all of a sudden take their word and allow an investigation. So the situation is, it was a very difficult situation for everyone concerned, but there was efforts to deal with it and care throughout and efforts of all involved. And of course, we tried in this case to use jury on retaliation cases and prevailed on that. And many of the issues that we're talking about right now were dealt with in front of the jury. But the jury found in favor of the district on retaliation content, there was no intent to retaliate against the school. And keeping in mind deliberate indifference is a lesser form of intent. It's more than that in terms of more than prosecution. The court has reminded us repeatedly that it is a lesser form of intent. So there is no evidence to suggest that Bloomfield and the school district or its officials had any intent to be deliberately indifferent and allow this school to be subjected to any harm. What it was doing was dealing with a situation that was not of its making, it was not of its parents, it was not in its curriculum, it was not in one of its schools. There was no one there. No parent was there, no school official was there. And we did the best we could with that difficult situation. We're trying to figure it out and determine what the facts are. An off-campus party, it's unsupervised. A place we have no responsibility for. We're trying our best to investigate the plan. Was this consensual or not? What happened here? We concluded essentially the same thing that the note that the grand jury did, that there was nothing that could be prosecuted here, that we couldn't determine clearly what happened. I say that at my time. Yes, thank you, Mr. Brandt. Mr. Keeley, you've saved time for a vote. So the term deliberate indifference would suggest that the school district just didn't care and did pretty much nothing, that the facts reflect just the opposite. There's no indication at all that the school district didn't care or refused to take action. I respectfully disagree, Your Honor. And I think the argument that was encountered in the case here goes exactly to the heart of what this case is. Essentially, their argument is because she wasn't on campus, because she withdrew from school, there was no on-campus bullying. And therefore, we had no idea what was going on. And as soon as we found out in January, we did the best we could. Well, why did she withdraw? Because when her parents went and reported the rape and said, we don't want my daughter going to school with a harasser, the response she received from the guidance counselor was, you don't know how bad it's going to be going up against the football team. Record, page 4687. Hours later, the counselor, instead of taking action against the athletes, which the Title IX coordinator said he has the power to immediately suspend while conducting an investigation, they're sending Ms. Fletcher lists of other schools that her daughter could attend. When the school district makes it clear that they're not going to separate Ma'Khia from her assailants, they say, all right, well, she's going to school at home then. And then, out of the goodness of their heart, they allow her to participate in a homebound program. Respectfully, that's not sure. The sarcasm really isn't necessary. That doesn't really get you anywhere professionally. What do you do with this record 3623, the mid-December message about how the police are saying now that it's okay to proceed? Excuse me. Is that the email I'm referring to on November 2nd? It's the one that the opposing counselor referred. He gave us two record references. The first was 5075, which he said was vague and isn't necessarily tied to this particular incident or investigation. And then he gave us 3623. Was that mid-December? The Langston email. That's right. Okay. The email – I don't have the email in front of me, so I can't address it specifically. I'd be glad to submit it to the DA later if I can answer your question more directly. Well, you heard him refer with a record reference to an email that indicated that the police are now saying that it's okay to proceed. Those are my words, but that's basically what it said. Essentially, yes. But the problem now is that if the school had started their investigation, not of the circumstances of the criminal rape, but of the bullying allegations that she had received as a result, immediately after or soon immediately after or shortly after the 15th when the rape was originally reported, they would have spoken to our client. They would have learned that she continued to harass her other fellow students. And the point is that the bullying does not have to occur on campus. The test for a Title IX violation is not, did something happen on the physical premises of the school? The test is, is there conduct between students that is so severe, pervasive, and offensive that it detracts from the victim's educational experience such that they are denied equal access to which resources and opportunities? If they had begun their investigation, they would have spoken to my client, and they would have learned what the other students were doing to her. That would have been discovered in October or November or December or any time before January 8th. So when the school district says, we had no idea that anything was going on until January 8th, and then suddenly we realized that we did the best we could, respectfully, that's not standard. They were required to conduct an immediate investigation, not of the criminal conduct, but of the harassment that occurred on campus. That is the crux here. We're not suggesting that the North Carolina Community School District is required to be a second-digit attorney's office. The conduct that they're concerned, of course, to be concerned about is how are these students treating each other? And is the student treatment of each other affecting the educational opportunities or their ability to participate in school? So they're required to do that even in the face of police requests that they not? Well, I guess that's the question there, Your Honor, is if you respectfully believe this is appropriate for a jury's consideration. What was the reasonable response here? We have the Louisville Officer Langston saying one thing, and the Secretary of Education saying something else. And interestingly enough, the Title IX Coordinating Coordinator, Michelle Ashby, said that she didn't even know what these Title IX requirements were. So I respectfully, a school district can't sit its head in the sand and play off. I should say we had no idea what the requirements were. We just did what the local police told us to, and therefore we weren't doing anything different. We just followed suit. I mean, there's evidence in the record suggesting that the lower-level administrators didn't even tell the Title IX administrators about a break until several days after the death, and they weren't even notified. I see my time is up, Your Honor. Yes, thank you, Mr. Keating. Your case is under submission. The case, United States v. Royazan, Provo.